UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KRISTIE G. ULRICH, | CASE NO. 5:21-CV-00383-PAG |
| Plaintiff, | JUDGE PATRICIA A. GAUGHAN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Kristie G. Ulrich filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On February 18, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 26, 2021). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

PROCEDURAL BACKGROUND

Ms. Ulrich filed for DIB and SSI on January 24, 2019, alleging a disability onset date of October 15, 2012. (Tr. 70, 104). The claims were denied initially and on reconsideration. (Tr. 83, 99, 119, 137). She then requested a hearing before an Administrative Law Judge. (Tr. 170). Ms. Ulrich (represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on June 9, 2020. (Tr. 31-68). On July 24, 2020, the ALJ issued a written decision finding Ms. Ulrich not disabled. (Tr. 12-25). The Appeals Council denied Ms. Ulrich's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Ulrich timely filed this action on February 18, 2021. (ECF #1).

FACTUAL BACKGROUND

I.  PERSONAL AND VOCATIONAL EVIDENCE

Ms. Ulrich was 43 years old at the time of her alleged onset date, and 51 years old at the time of the administrative hearing. (Tr. 69). She completed the twelfth grade. (Tr. 42). In the past, Ms. Ulrich has been employed in the billing department of a medical practice. (*Id.*).

II.  RELEVANT MEDICAL EVIDENCE[1]

Ms. Ulrich has a long history of spine impairment and treatment including a lumbar discectomy and laminectomy in 1996, an anterior cervical discectomy and fusion in 2008, and a

---

[1]     The Commissioner narrows the relevant medical evidence to Ms. Ulrich's physical conditions because her argument relates only to the physical residual functional capacity (RFC). (Comm'r Br., ECF #20, PageID 1275). Ms. Ulrich similarly only addresses the medical records relating to her physical impairments. (Pl's Br., ECF #17, PageID 1248-51). Therefore, I summarize only the medical records that concern Ms. Ulrich's physical impairments.

lumbar posterior spinal fusion with placement of hardware in 2010 (with revision the following month to fix loosened screws). (Tr. 375-76).

In March, April, June, August, and November 2013, Ms. Ulrich presented at the emergency department with complaints of back pain. (Tr. 416-17, 418-19, 423-26, 426-27, 429-30). In March, Ms. Ulrich complained of low back pain and resulting disrupted sleep. (Tr. 429). She exhibited low back tenderness but normal reflexes, muscle tone, and coordination. (Tr. 430). In April, Ms. Ulrich experienced worsened low back pain radiating down her legs. (Tr. 426). Physical examination revealed decreased range of motion, tenderness, pain, and spasm in her lumbar spine. (Tr. 427). An X-ray showed the lumbar spinal hardware remained in good position without fracture or dislocation. (*Id.*). In June, Ms. Ulrich complained of neck pain similar to the pain she felt before her cervical fusion. (Tr. 423). She displayed spinous process and muscular tenderness and decreased range of motion. (Tr. 424). Ms. Ulrich explained she woke up with throbbing on both sides of her neck and numbness and tingling in her hands. (Tr. 425). An MRI showed no acute pathology. (Tr. 425).

In July 2013, Ms. Ulrich established as a new patient with Robert Bales, M.D. (Tr. 421). At that time, she complained of neck and lower back pain, endorsing weakness, imbalance, and difficulty performing daily activities. (*Id.*). Dr. Bales referred Ms. Ulrich to pain management. (Tr. 423).

In August 2013, at the emergency department, Ms. Ulrich complained of low back pain, noting that she was watching her grandchild, an active toddler. (Tr. 418). She denied feelings of numbness or weakness. (*Id.*). Physical examination revealed decreased lumbar range of motion, tenderness, pain, and spasm. (Tr. 419). She displayed soreness along the paravertebral musculature

of the lumbar region and exhibited a positive straight leg raise (SLR) test at thirty degrees, bilaterally. (*Id.*). Similar findings were made during her November 2013 emergency department visit, except her SLR test was negative. (Tr. 417).

In December 2014, imaging of Ms. Ulrich's spine showed disc space narrowing in the lumbar spine and osteophytes in the cervical spine. (Tr. 490-91, 492-93).

In March 2015, Ms. Ulrich established care with Colleen Clayton, M.D. (Tr. 411). There she described a constant pulling sensation down the back of her legs. (*Id.*). Ms. Ulrich informed Dr. Clayton that she had weaned off narcotics and was happier that way. (*Id.*). At multiple visits in 2015, Ms. Ulrich complained of leg and back pain. (404, 410).

In mid-October 2018, Dr. Clayton ordered an EMG to address Ms. Ulrich's complaint of bilateral numbness in her hands and fingers, which confirmed Ms. Ulrich has bilateral carpal tunnel syndrome. (Tr. 385-86). At an appointment with Dr. Clayton on October 30, 2018, Ms. Ulrich complained of hip pain and a grinding sensation in the posterior hip/lower back area when walking. (Tr. 384). Ms. Ulrich explained she was struggling to get work done and it was taking her a few hours to get going in the morning. (*Id.*). She had back tenderness on extension; her physical examination was otherwise normal. (*Id.*). Dr. Clayton referred her to the spine clinic. (*Id.*).

On November 6, 2018, after meeting with Deborah Venesy, M.D., and explaining her symptoms (grinding feeling in the lower back, lower back pain, aggravated by sitting or standing over ten minutes and alleviated by stretching and flexion), Ms. Ulrich was sent to Jason Savage, M.D., for a surgical consultation. (Tr. 380-83). After reviewing Ms. Ulrich's past medical history, viewing the spinal imaging, and speaking with Ms. Ulrich about her symptoms and aggravating and alleviating factors, Dr. Savage assessed her with spinal stenosis with neurogenic claudication

4

and degenerative spondylolisthesis.[2] (Tr. 375-78). Dr. Savage observed "markedly mobile L3-L4 spondylolisthesis" on X-ray and felt it was likely due to a pars fracture. (Tr. 378). Dr. Savage ordered a lumbar CT scan to assess for a pars defect and a lumbar MRI scan to evaluate nerve compression. (*Id.*). The imaging revealed dynamic/mobile spondylolisthesis and severe stenosis at L3-L4. (Tr. 373). Dr. Savage recommended surgery. (*Id.*).

On February 20, 2019, Dr. Savage removed the posterior spinal instrumentation at L4-L5, and placed new posterior spinal instrumentation from L3-L5. (Tr. 572). In addition, he performed a posterior spinal fusion, a transforaminal lumbar interbody fusion, and a posterior column osteotomy using locally autografted bone at L3-L4. (*Id.*). Operative findings included severe spinal stenosis and foraminal stenosis at L4-L5. (*Id.*). Dr. Savage's postoperative diagnosis was L3-L4 degenerative spondylolisthesis and lumbar spinal stenosis with radiculopathy. (Tr. 571). Ms. Ulrich was discharged on February 22, 2019. (Tr. 584).

When Ms. Ulrich had surgical staples removed on March 7, she complained of low back and bilateral hip pain. (Tr. 667). She explained she declined to take the prescribed pain medication due to her history of opioid abuse. (*Id.*). On exam, Ms. Ulrich had bilateral trochanteric bursa tenderness. (*Id.*). She was instructed to take Mobic for postoperative and hip pain. (*Id.*).

On April 1, 2019, Dr. Clayton noted Ms. Ulrich had significant improvement but continued to struggle with diffuse, burning pain, mostly in the lateral hips, and burning feet. (Tr.

---

[2] "Spondylolisthesis" occurs when one vertebra slips forward upon another. 7 Attorney's Medical Advisor § 71:149, *Spondylolysis and spondylisthesis – Generally*. Symptoms may include lumbar back pain possibly radiating into the legs, hamstring muscle spasms, limited motion, and tenderness in the area of slippage. *Id* at § 71:152. *Spondylolysis and spondylolisthesis – Symptoms and diagnosis*.

752). Physical examination revealed a straight and symmetric back, but Ms. Ulrich displayed tenderness along the lumbar paraspinal muscles and bilateral sacroiliac joints. (Tr. 753). She agreed to take Cymbalta to address chronic pain and a depressive episode. (Tr. 751).

During a follow-up appointment on April 18, 2019, Dr. Savage noted Ms. Ulrich was doing well postoperatively as her leg pain had resolved, but she continued to complain of low back pain and increased sensitivity in the lumbar/buttock region. (Tr. 879). He made note of Ms. Ulrich's prescription medications, including Mobic, Tylenol, Cymbalta, and tramadol. (*Id.*). An updated lumbar X-ray showed improved lumbar alignment with reduction of anterolisthesis at L3-L4 and osteopenia and degenerative changes in the hips. (Tr. 885).

On May 2, 2019, Ms. Ulrich reported that taking Cymbalta only minimally improved her mood and did not help to alleviate her chronic pain in her elbows, knees, hips, and shoulders. (Tr. 946). Examination of her knees was normal except she had tenderness at the medial joint line. (*Id.*). X-rays of her knees revealed symmetric lateral compartment narrowing with mild subchondral sclerosis, consistent with mild to moderate lateral compartment degenerative arthritis, and diffuse bilateral osteopenia. (Tr. 953). The interpreting physician concluded mild bilateral compartment degenerative arthritis evidenced by cartilage loss. (*Id.*). This is the last medical record reviewed by the State agency reviewing physicians. (*See* Tr. 110).

In November 2019, Ms. Ulrich followed up with Dr. Savage, where she reported increased back pain and numbness and tingling in her feet after standing/walking for more than five minutes. (Tr. 1044). Updated X-rays showed mild thoracolumbar levoscoliosis and good positioning of hardware. (Tr. 1042). Dr. Savage recommended Ms. Ulrich for physical therapy. (Tr. 1044).

In April 2020, due to the COVID-19 pandemic, Ms. Ulrich spoke with Dr. Savage over the telephone. (Tr. 1045). She reported being unable to attend physical therapy for the same reason. (*Id.*). She reported resolution of her preoperative pain, but also continued to have severe, non-radiating low back pain and intermittent numbness from the waist down with prolonged standing. (*Id.*). Her symptoms were aggravated by standing and walking, and alleviated by sitting and lying down. (*Id.*). An updated lumbar X-ray revealed increased L3 on L4 anterolisthesis "with increased periprosthetic lucency," which may represent loosening of the hardware. (Tr. 1063). A CT scan of the lumbar spine showed L2-L3 spondylosis with left foramen encroachment. (Tr. 1065-66).

In light of Ms. Ulrich's complaint of numbness from the waist down with standing and walking, Dr. Savage ordered lumbar and thoracic MRIs to rule out any significant nerve or cord compression. (Tr. 1077). The thoracic scan showed some small disc bulges "at the levels intervening T6-T10, without significant spinal canal narrowing." (Tr. 1057). The lumbar scan showed disc desiccation and mild diffuse disc bulge in conjunction with facet and ligamentous hypertrophy contributing to mild spinal canal narrowing and mild left foraminal narrowing at L2-L3; disc desiccation, mild disc height loss, and a disc bulge without significant spinal canal narrowing at L3-L4; disc desiccation and mild anterior predominant disc height loss at L4-L5, with a persistent subtle obscuration of the left subarticular zone along the traversing left L5 nerve roots; and minimal disc bulge and ligamentous hypertrophy, contributing to right greater than left subarticular zone narrowing, with bilateral subarticular zone narrowing at L5-S1, and questionable encroachment upon the traversing S1 nerve roots. (Tr. 1058). The impression was edema involving the L3 vertebral body "which could indicate loosening associated with either or both of the L3 [pedicle] screws," multilevel postoperative and spondylotic changes in the lumbar spine with mild

spinal canal stenosis at L2-L3, multilevel subarticular zone narrowing and mild foraminal narrowing. (*Id.*).

Dr. Savage concluded the MRI "overall looks okay," and that the etiology of her symptoms remained unclear. (Tr. 1076). He referred Ms. Ulrich for a consultation with the Neurology Department. (*Id.*).

On May 27, 2020, Ms. Ulrich met with Joshua Gordon, M.D. for a neurological consultation. (Tr. 1072). Dr. Gordon noted Ms. Ulrich was in some discomfort but her neurological examination was normal. (Tr. 1074). She had normal muscle bulk and strength throughout, symmetric muscle stretch reflexes, normal sensation to light touch and pinprick, normal coordination and a normal gait and station. (*Id.*). In addition, the Romberg test was negative. (*Id.*). Dr. Gordon also reviewed the recent MRI results. (*Id.*). He concluded "there is little evidence for new or unexpected neurological dysfunction on examination." (*Id.*).

IV.  MEDICAL OPINIONS

On April 14, 2019, Ms. Ulrich met with Herschel Pickholtz, Ed.D., for a clinical interview and mental status evaluation. (Tr. 860). Dr. Pickholtz opined as to Ms. Ulrich's abilities to understand, remember, and carry out instructions; to maintain attention, concentration, persistence and pace; to respond to supervision and coworkers; and to respond to work pressures, and determined she was not significantly impaired. (Tr. 867-68).

State agency reviewing physicians reviewed Ms. Ulrich's record at the initial and reconsideration levels. At the initial level, the consultant reviewed medical records up to April 2019. (Tr. 76). The reviewing physician opined Ms. Ulrich could lift and/or carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours, and sit for about

8

six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and avoid all exposure to hazards such as dangerous machinery and unprotected heights. (Tr. 81-82).

The most recent medical record the State agency reviewing physician at the reconsideration level reviewed was from May 2019. (*See* Tr. 110). The reviewing physician offered the same limitations with an additional restriction to occasional pushing and pulling with the bilateral lower extremities. (Tr. 114).

## III.   ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Ulrich and VE Daniel Simone, presented during the hearing before the ALJ.

Ms. Ulrich lives with her husband. (Tr. 47-48). Ms. Ulrich testified to having more bad days than good days. (Tr. 48). On good days, Ms. Ulrich is able to sit outside and converse with other people. (*Id.*). On bad days, she stays inside and sits on the sofa. (*Id.*). Her pain is better in warmer weather. (Tr. 50). About once a week, and sometimes more often, Ms. Ulrich stays in bed. (Tr. 53).

Ms. Ulrich testified she feels a grinding sensation in her spine when she walks. (Tr. 45-46). She experiences numbness, tingling, and hot spots all over her body. (Tr. 46). Prolonged standing causes numbness from the waist down. (*Id.*). Ms. Ulrich testified she does not cook, clean, or do laundry; her husband takes care of the household chores. (*Id.*). Standing at the sink to do dishes causes pain to the point of tears. (Tr. 49). Ms. Ulrich shaved her head to decrease the time she must stand in the shower. (*Id.*).

Ms. Ulrich admitted to a past problem using pain medications, has been sober since the end of 2013, and will not take any prescription pain medication. (*Id.*). She takes Tylenol and anti-inflammatories for arthritic pain. (*Id.*).

Ms. Ulrich estimates she can comfortably lift less than five pounds. (Tr. 51). She can stand for three minutes before she must sit down. (*Id.*). Ms. Ulrich can walk to the end of the driveway but is in so much pain she must rest before returning to the house. (*Id.*). She struggles getting up the three steps to get into her home. (*Id.*) ("I can do it, but it's slow"). It also takes time for Ms. Ulrich to crouch or squat to pick up objects from the floor. (*Id.*). She remains cognizant of body positioning because if she moves the wrong way, she loses sensation from her waist down. (Tr. 52). Ms. Ulrich is able to reach overhead but sometimes has difficulty gripping items; bilateral carpal tunnel syndrome causes her hands to become numb. (*Id.*). She has panic attacks about once or twice a week. (*Id.*). Ms. Ulrich does not have an issue with concentration, but she does need more time to complete tasks because she moves slowly. (Tr. 52-53). Upon questioning from the ALJ, Ms. Ulrich clarified that, though she alleged a disability onset date in 2012, her physical impairments progressively worsened in recent years. (Tr. 54) ("it's been on and off with the mental stuff, since 2012, but the physical part of it really started in .... [20]18."). She feels worse now than she has ever felt. (*Id.*).

When Ms. Ulrich was diagnosed with carpal tunnel syndrome, her doctor offered injections for relief. (Tr. 55). Ms. Ulrich opted to forgo injections in part because of the potential risk of more damage, as explained by her doctor. (*Id.*). She has not gone to physical therapy but wears arm braces when she sleeps so the pain does not wake her up in the middle of the night. (Tr. 55-56).

Ms. Ulrich sees a therapist for her mental health issues regularly. (Tr. 53). Before the COVID-19 pandemic, Ms. Ulrich went to her therapist's office for sessions every two weeks; now she speaks with her therapist over the phone once a month. (*Id.*).

Ms. Ulrich's husband drives her to in-person medical appointments. (*Id.*). Ms. Ulrich does not drive because she cannot sit for more than a few minutes without shifting positions. (*Id.*). While sitting as a passenger, Ms. Ulrich is able to reposition as needed to reduce her pain. (*Id.*).

When Ms. Ulrich worked in the billing department of a medical practice, she remained seated most of the day, walking a little bit to get charts and medical files. (Tr. 43). Ms. Ulrich testified she would not be able to perform her past work because it is difficult for her to remain in one position for more than a few minutes. (Tr. 55). She must constantly reposition. (*Id.*).

The VE then testified. He identified Ms. Ulrich's past relevant work as a data entry clerk (DOT 203.582-054, semi-skilled, SVP 4).[3] The VE stated it is typically performed at a sedentary exertion level, but in light of Ms. Ulrich's testimony to lifting up to twenty pounds, she performed this position at the light exertion level. (Tr. 58).

The ALJ asked the VE if a hypothetical individual of Ms. Ulrich's age, education, and job history could perform Ms. Ulrich's past relevant work under the following restrictions: able to occasionally lift and carry, including upward pulling, twenty pounds, ten pounds frequently; able to stand and/or walk with normal breaks for six hours of an eight-hour work day; able to sit with normal breaks for six hours in an eight-hour day; can occasionally push and pull with the bilateral

---

[3]         "DOT" refers to the *Dictionary of Occupational Titles*, published by the Department of Labor. 20 C.F.R. §§ 404.1566(d), 416.966(d). "SVP" stands for Specific Vocational Preparation and refers to the amount of time a typical worker requires to learn the techniques, acquire the information, and develop the facility needed for average performance of a job. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 851 n.6 (6th Cir. 2010).

lower extremities; occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolding; occasionally balance, kneel, stoop, crouch, and crawl; should avoid hazardous machinery, unprotected heights, and commercial driving; with only occasional changes in workplace tasks or duties that are explained in advance and introduced gradually. (Tr. 58-59). The VE responded the individual could perform Ms. Ulrich's past relevant work both as generally performed and as she performed it. (Tr. 59-60). He identified other light, unskilled positions such an individual could perform, including:

- Housekeeping cleaner (DOT 323.687-014, SVP 2);

- Cafeteria attendant (DOT 311.677-010, SVP 2); and

- Routing clerk (DOT 222.687-022, SVP 2).

(Tr. 60). If further restricted to standing and/or walking for four hours in an eight-hour day, that individual could still perform Ms. Ulrich's past relevant work both as generally performed and as she performed it. (*Id.*). He identified other light, unskilled positions such an individual could perform, including:

- Inspector and hand packager (DOT 559.687-074, SVP 2);

- Marker (DOT 209.587-034, SVP 2); and

- Router (DOT 222.587-038, SVP 2).

(Tr. 61-62). If, under the original and modified restrictions set forth above, the individual was additionally restricted to frequent handling and fingering bilaterally, past work would be precluded but the individual could still perform the other identified positions. (Tr. 62).

The ALJ next asked the VE to consider another hypothetical individual limited to the following: able to occasionally lift and/or carry, including upward pulling, ten pounds, less than

ten pounds frequently; stand and/or walk with normal breaks for two hours in an eight-hour workday; sit with normal breaks for six hours in an eight-hour work day; frequently handle and finger bilaterally; occasionally push and pull with the bilateral lower extremities; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, kneel, stoop, crouch, and crawl; must avoid commercial driving, operating hazardous machinery, and working at unprotected heights; with only occasional changes in workplace tasks or duties that are explained in advance and introduced gradually. (Tr. 62-63). Under this set of restrictions, the individual would not be able to perform Ms. Ulrich's past relevant work. (Tr. 63).

The ALJ then asked the VE if there were other positions an individual under the age of 50 could perform under those restrictions. (*Id.*). The VE identified three sedentary, unskilled positions:

- Document preparer (DOT 249.587-018, SVP 2);

- Call-out operator (DOT 237.367-014, SVP 2); and

- Nut sorter (DOT 521.687-086, SVP 2).

(Tr. 63-64).

If the hypothetical individual did not have any fingering and handling restriction, the individual could perform Ms. Ulrich's past relevant work as generally performed. (Tr. 64). However, if restricted to occasional bilateral fingering and handling, such an individual would be precluded from all sedentary positions. (Tr. 66).

The VE testified that absenteeism in excess of one day per month is work preclusive, as is being off-task more than 15% of the workday. (Tr. 65).

13

THE ALJ'S DECISION

The ALJ's decision, dated July 29, 2020, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2019.

2. The claimant has not engaged in substantial gainful activity since October 15, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: chronic bilateral low back pain without sciatica/degenerative disc disease of the lumbar spine with radiculopathy – status post multiple surgeries, degenerative disc disease of the cervical spine – status post fusion, mild degenerative changes of the bilateral hips, osteoarthritis of the bilateral knees, major depressive disorder/bipolar disorder, anxiety disorder, and substance abuse disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with occasionally lifting and/or carrying, including upward pulling, up to 20 pounds; frequently lifting and/or carrying, including upward pulling, up to 10 pounds; standing and/or walking, with normal work breaks for a total of 6 hours in an 8-hour workday; sitting, with normal breaks, for about 6 hours in an 8-hour workday; pushing and/or pulling, including the operation of hand/foot controls, is unlimited, other than as shown for lifting and/or carrying, except occasional pushing and pulling with the bilateral [lower][4] extremities; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; never climbing ladders, ropes, or scaffolds; avoid commercial

---

[4]    The ALJ's written decision refers to the "occasional pushing and pulling with the bilateral upper extremities," whereas the transcript of the hearing and the State agency reviewing physician's reports refer to bilateral lower extremities. (*Compare* Tr. 20 with Tr. 59, 63, 114, 132). The reference to "bilateral upper extremities" appears to be a scrivener's error. I therefore treat the limitation as occasional pushing and pulling with the bilateral lower extremities.

driving, work around unprotected heights, or operating on or around dangerous machinery; and can work in a setting with no more than occasional, gradually introduced, and explained in advance changes in workplace tasks or duties.

6.    The claimant is capable of performing past relevant work as a data entry clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2012, the alleged onset date, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 15-25). The ALJ concluded:

Based on the application for a period of disability and disability insurance benefits protectively filed on January 24, 2019, the claimant is not disabled under sections 261(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on January 24, 2019, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 25).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

16

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

17

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Ulrich claims the ALJ erred in two respects. First, the ALJ's RFC, which mirrors the State agency determination at the reconsideration level, is not supported by substantial evidence because the State agency reviewing physician's findings, on which the ALJ relies, do not take into account later acquired medical records. (Pl's Br., ECF #17, PageID 1253). Ms. Ulrich suggests the ALJ should have taken more action to develop the record by, for example, re-contacting her medical providers or ordering a consultative examination. (*Id.* at PageID 1256). Second, Ms. Ulrich argues the ALJ did not properly analyze her subjective, pain-related statements or adequately explain the reasons for the weight given to her individual symptoms. (*Id.* at PageID 1260).

In response to Ms. Ulrich's first argument, the Commissioner claims substantial evidence supports the ALJ's RFC determination, and, in making that determination, the ALJ appropriately considered the relevant objective medical evidence and opinions. (Comm'r's Br., ECF #20, PageID 1278). The Commissioner argues the ALJ has discretion to determine whether additional evidence is necessary. (*Id.* at PageID 1280). As to Ms. Ulrich's second argument concerning her pain-related statements, the Commissioner responds that the ALJ properly considered the objective medical and other relevant evidence, including the location, duration, frequency, and intensity of her symptoms, precipitating and aggravating factors, the effectiveness of medication, and other measures she takes to deal with pain. (*Id.* at PageID 1281-82).

18

**Residual Functional Capacity Evaluation**

An individual's impairments, and any related symptoms, such as pain, may cause physical and mental limitations that affect what the individual can do in a work setting. 20 C.F.R. §§ 404.1545(a), 416.945(a). The residual functional capacity – what individuals can still do despite their limitations – is a function-by-function assessment of an individual's ability to do work-related activities, the determination of which is based on all the relevant evidence in the case record including medical history, signs and laboratory findings, the effects of treatment, reports of daily activities, medical opinions, and the effects of symptoms, including pain. SSR 96-8p. The ALJ is responsible for the assessment of an individual's RFC. §§ 404.1546(c), 416.946(c). The ALJ must provide a narrative discussion describing how the evidence supports each conclusion, citing medical facts such as laboratory findings and nonmedical evidence such as reports of daily activities. SSR 96-8p.

The Sixth Circuit has held that an ALJ may rely on medical opinions from State agency reviewing physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating his opinion. *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. Appx 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance on state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered evidence that was developed post-dating those opinions); *see also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513 (6th Cir. 2013) ("Even if [a State agency physician's] RFC was completed without knowledge of these issues, however, the record reflects that the ALJ considered them."); *Patterson v. Comm'r of Soc. Sec.*, No. 1:16-cv-110, 2017 WL 914272, at *10 (N.D. Ohio Mar. 8, 2017) ("An ALJ may rely on a state

agency reviewer who did not review the entire record, so long as the ALJ also considers the evidence post-dating the opinion.").

Nevertheless, courts have stressed the importance of medical opinions to support an RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data. *Isaacs v. Astrue,* No. 1:08-CV-00828, 2009 WL 3672060, at *10 (S.D. Ohio 2009)) ("The RFC opinions of treating physicians, consultative physicians, and medical experts who testify at hearings are crucial to determining a claimant's RFC because '[I]n making the RFC finding, the ALJ may not interpret raw medical data in functional terms.'") (quoting *Deskin v. Comm'r of Soc. Sec.,* 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008); *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the [RFC] determination."). The result of an MRI is considered raw medical data. *See Mabra v. Comm'r of Soc. Sec.*, No. 2:11-cv-00407, 2012 WL 2319245, *9 (S.D. Ohio June 19, 2012).

In some circumstances, the ALJ may need to recontact a treating source, order a consultative examination, or have a medical expert testify at the hearing in order to develop the record fully, such as when the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations, or only an outdated non-examining agency opinion. *See Deskin*, 605 F. Supp. 2d at 912. This is not a bright-line test and "potentially applies only when [1] an ALJ makes a finding of work-related limitations based on no medical source opinion or [2] an outdated source opinion that does not include consideration of a critical body of objective medical evidence." *Kizys v. Comm'r of Soc. Sec.*, 2011 WL 5024866, *2 (N.D. Ohio 2013).

20

Here, the ALJ relied on outdated opinions from State agency reviewing physicians. The transcript contains approximately one years' worth of medical records that were not subjected to physician review, including a number of later diagnostic imaging results, such an April 2020 lumbar X-ray that revealed increased L3 on L4 anterolisthesis "with increased periprosthetic lucency," (Tr. 1063), an April 2020 CT scan of the lumbar spine that showed L2-L3 spondylosis with left foramen encroachment, and a May 2020 MRI showing vertebral edema that could represent loosening of surgically implanted hardware, multilevel postoperative and spondylotic changes in the lumbar spine, and mild canal stenosis at L2-L3.

Because no State agency reviewing physician or other medical consultant reviewed and offered an updated opinion regarding the limiting effects of Ms. Ulrich's physical condition on her functional abilities, the ALJ acted outside of her expertise and interpreted the objective medical evidence on her own in assessing Ms. Ulrich's RFC. Although the imaging results are accompanied by Ms. Ulrich's physician notes, this is insufficient evidence for the ALJ to rely on, as the treatment notes do not provide a medical opinion of Ms. Ulrich's functional abilities. Therefore, in this circumstance, the ALJ should have taken steps to develop the record fully and obtain a more recent medical opinion.

**Evaluation of Pain-Related Statements**

When determining whether a claimant is disabled, the ALJ will "consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical and other evidence." 20 C.F.R. § 404.1529(a).

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including:

(1)     a claimant's daily activities;
(2)     the location, duration, frequency, and intensity of pain or other symptoms;
(3)     factors that precipitate and aggravate the symptoms;
(4)     the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
(5)     treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
(6)     any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
(7)     any other factor concerning the claimant's functional limitations and restrictions due to pain and other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also* SSR 16-3p. The ALJ is not required to analyze all seven factors, but only those factors germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ finds it inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-

3p. An ALJ may not "disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged," but must also consider "other evidence in the record" such as "statements from the individual, medical sources, or any other sources." *Id.*

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing – an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from them. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ found Ms. Ulrich's medically determinable impairments could reasonably be expected to cause the alleged limitations but determined Ms. Ulrich's statements concerning the intensity, persistence, and limiting effects of the symptoms were less than fully consistent with the evidence, and offered the following in support of this conclusion: the diagnostic test results and physical examination findings were largely unremarkable, and Ms. Ulrich "saw significant improvement following her spinal surgeries." (Tr. 22). As an example of "significant improvement" the ALJ cited findings from the neurological consultation—normal gait and station, normal sensation, a negative Romberg test, and normal muscle strength. (*Id.*).

Ms. Ulrich argues that the ALJ failed to build a logical bridge between the evidence and her conclusion that she saw significant improvement after the surgery because the ALJ provided no evidence supporting that conclusion. (Pl's Br., ECF #17, PageID 1259). I find the ALJ pointed to some evidence in support, but that evidence is not the "substantial, credible evidence" necessary to support his conclusions.

In support, the ALJ cited findings from one neurological examination that revealed normal gait and station, normal sensation, a negative Romberg test, and normal muscle strength. (Tr. 22). However, even before surgery, Ms. Ulrich consistently displayed normal gait, sensation, and muscle strength. (Tr. 378, 382-383, 384, 389, 404, 410, 414, 417). Despite these normal findings, Ms. Ulrich was still recommended for surgery. When considered in that context, evidence of normal examination findings—on which the ALJ relies—does not support a conclusion that Ms. Ulrich experienced significant improvement after her surgery.

Moreover, while the ALJ was not required to accept Ms. Ulrich's subjective complaints, she was required to explain which of an individual's symptoms she finds consistent or inconsistent with the evidence of record and how the ALJ's evaluation of Ms. Ulrich's symptoms led to her conclusions. SSR 16-3p. Instead of providing such analysis, the ALJ summarized Ms. Ulrich's hearing testimony and discounted the lot of it based on unremarkable diagnostic test results and significant improvement after spinal surgery. This perfunctory analysis fails to address several of Ms. Ulrich's complaints, including numbness and tingling in her hands that cause grip issues, which Ms. Ulrich testified to at the hearing.

While the ALJ acknowledged Ms. Ulrich's hearing testimony contained a statement to that effect, (Tr. 20), Ms. Ulrich's complaint was discredited for the same reason all her other symptoms

were discredited – unremarkable diagnostic testing and significant postoperative improvement. This is problematic because diagnostic testing related to Ms. Ulrich's hand numbness and tingling was not "unremarkable"; it confirmed the presence of bilateral carpal tunnel syndrome. Nor would her lumbar spinal surgery have caused any significant improvement in the condition. The ALJ decision fails to cite relevant evidence that is inconsistent with Ms. Ulrich's hand complaints, but discounts the complaints all the same. This failure to explain which of an individual's symptoms are consistent or inconsistent with the medical and other evidence is error and precludes this Court from conducting a meaningful review of the decision.

The ALJ erred in the RFC assessment and in the evaluation of Ms. Ulrich's symptoms. I recommend the District Court reverse the Commissioner's decision denying benefits and remand for further proceedings consistent with this Report and Recommendation.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying disability insurance benefits and supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: June 6, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).